UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------X
ASCENTO CAPITAL, LLC,

               Plaintiff,

          - against -

MINERVAWORKS, LLC, MINERVAWORKS HOLDINGS,
INC., RODNEY BOWERS, XALLES HOLDINGS,
INC., XALLES TECHNOLOGY, INC., and THOMAS
NASH,

               Defendants.
------------------------------------X

**MEMORANDUM AND ORDER**

20 Civ. 6195 (NRB)

**NAOMI REICE BUCHWALD**
**UNITED STATES DISTRICT JUDGE**

Plaintiff Ascento Capital, LLC ("Ascento"), a financial advisory firm, initiated suit against MinervaWorks, LLC ("Minerva"); MinervaWorks Holdings, Inc. ("MWH"); Rodney Bowers ("Bowers"), the Chief Executive Officer ("CEO"), President, and Founder of Minerva and MWH; Xalles Holdings, Inc. ("Xalles"); Xalles Technology, Inc. ("XTI"); and Thomas Nash ("Nash"), the Founder, President, CEO and Chief Financial Officer of Xalles and the President and CEO of XTI, alleging that defendants failed to pay Ascento for its consulting, valuation, and marketing services.

Central to this dispute is Minerva's engagement of Ascento as its financial advisor in July 2019. In exchange for Ascento's services, which were intended to advise and prepare Minerva in connection with its M&A-related activity, Minerva agreed that Ascento would receive 5% of the total compensation obtained by

Minerva upon its sale.  In March 2020, Minerva and its parent company, MWH, negotiated the sale of Minerva to Xalles, whose wholly owned subsidiary is XTI.  According to Ascento, Minerva has not paid to Ascento the 5% fee arising from the transaction with Xalles.  Thus, Ascento initiated this action against Minerva, MWH, and Bowers (the "Minerva Defendants"), as well as against Minerva's acquiror, Xalles (together with XTI and Nash, the "Xalles Defendants").[1]

The Minerva Defendants move to dismiss the complaint in its entirety for lack of personal jurisdiction and also move to dismiss plaintiff's fraud claim for failure to state a claim on which relief can be granted.  For the reasons set forth below, the Court grants in part and denies in part defendants' motion to dismiss.

I.  **Background**[2]

Ascento, a financial advisory firm, is a Delaware limited liability company, whose sole member is a New York citizen, with its principal place of business in New York.  Minerva, a technology company, is a Delaware limited liability company, whose members are citizens of Georgia and Massachusetts.  MWH, a Delaware corporation, is Minerva's parent company.  Both Minerva and MWH

---

[1] The Xalles Defendants have not appeared in this lawsuit, however Xalles and XTI have been served.  ECF Nos. 18, 19, 21.

[2] The following facts, which are drawn from the operative complaint, are accepted as true for purposes of the Court's ruling on defendant's motion to dismiss.  The Court draws all reasonable inferences in plaintiff's favor.  See Koch v. Christie's Int'l PLC, 699 F.3d 141, 145 (2d Cir. 2012).

work from 1600 Parkwood Circle SE, Suite 300, in Atlanta, Georgia. Bowers, a Georgia citizen, is the founder, president, and CEO of Minerva and MWH, who likewise works at 1600 Parkwood Circle.[3]

In May 2019, Minerva and its CEO at the time, Roy DiBenerdini, began discussions with Ascento on Minerva's behalf. A few months later, on July 16, 2019, Ascento and Minerva executed a written contract ("Contract"), governed by the laws of Delaware, which retained Ascento as its "exclusive M&A financial advisor." Bowers signed the Contract on behalf of Minerva. The Contract specified that either party could terminate the Contract in writing on or after three calendar months. Per the Contract, Ascento would facilitate the sale, merger, consolidation, recapitalization, or reinvestment of Minerva by a third-party. More specifically, Ascento would provide various services, as requested by Minerva, including overall strategy development, the review of an executive summary and management presentation, valuation, the production of a target matrix to identify potential customers, negotiation, and structuring. In exchange, the Contract provided that if a

---

[3] A limited liability company takes the citizenship of its members. Bayerische Landesbank, New York Branch v. Aladdin Capital Mgmt. LLC, 692 F.3d 42, 49 (2d Cir. 2012). After we noticed that the complaint lacked allegations sufficient to establish diversity jurisdiction, we requested that the parties provide us with facts regarding the citizenship of each member of Ascento Capital, LLC and MinervaWorks, LLC. See Avant Cap. Partners, LLC v. W108 Dev. LLC, 387 F. Supp. 3d 320, 322 (S.D.N.Y. 2016) (requiring plaintiff to "file affidavits or an amended complaint . . . adequately establishing the existence of subject-matter jurisdiction" when the Court determined that the complaint did not adequately allege the existence of diversity jurisdiction). The parties furnished this information promptly, ECF Nos. 40, 41, and their submissions satisfy the requirements of diversity jurisdiction.

transaction were consummated during the period of engagement or in the twelve months following the termination of the Contract, then Minerva would pay Ascento 5% of the aggregate purchase price received by Minerva or its stockholders.

Following the Contract's execution, Ascento provided services to Minerva from its office in New York.  Among other services, Ascento invested dozens of hours making telephone calls and sending emails to develop an overall strategy for Minerva's sale; over 60 hours creating the executive summary; over 50 hours drafting Minerva's management presentation; over 40 hours calculating Minerva's valuation; and over 50 hours devising and updating the target matrix to identify potential customers.  In total, Ascento estimates that it spent at least 330 hours providing financial advisory services to Minerva and positioning Minerva to attract customers.

On January 3, 2020, Ascento learned that Minerva's previous CEO, DiBenerdini, had been terminated by Minerva.  Five days later, on January 8, Ascento called Bowers to confirm that Minerva wanted to continue to use Ascento's services notwithstanding the change in management.  The same day, Bowers emailed Ascento to affirm Minerva's satisfaction with its services and to express his desire to keep working together, stating, "I want to continue with you as our agent/broker/advisor per the agreement in effect with

MinervaWorks.  And as such, you and I will [] work together on equity, merger or acquisition opportunities."

Ascento, therefore, kept working for Minerva, which by this point possessed the work products created by Ascento.  On January 15, 2020, Ascento emailed Bowers regarding discussions with a potential buyer, and Bowers responded, "[t]hank you."  The same day, Bowers informed Ascento by phone that Minerva was taking a hiatus from pursuing its M&A activity to focus on its internal business, but assured Ascento that he would contact it when Minerva was prepared to resume its M&A activity.

Though Minerva did not contact Ascento in the interim, on March 18, 2020, MWH entered into a share purchase agreement with Xalles, by which the Xalles Defendants would acquire MWH and its subsidiaries, including Minerva (the "Transaction").  Ascento learned about the Transaction with Xalles from a press release on March 19, 2020.  Ascento attempted to contact Minerva and Bowers multiple times over the course of the next week to ascertain details of the Transaction and seek compensation pursuant to the Contract.  On March 27, 2020, Bowers spoke on the phone to Ascento and said, in relevant part: that the Transaction would close on March 31, 2020; that Xalles and Nash, Xalles' CEO, were aware of Ascento's role as Minerva's exclusive financial advisor; that he promised to provide a provision in the Minerva-Xalles share purchase agreement stipulating that any seller-broker would be

compensated; and that he would provide flow of funds documents, with Ascento's compensation included. Bowers, however, failed to insert the promised provision or to provide the flow of funds documents, nor did he respond to Ascento's emails of March 27 and March 30, 2020. Ascento separately emailed Nash seeking information about the Transaction and to provide to Nash a copy of the Contract.

On March 31, 2020, the Minerva Defendants became wholly owned subsidiaries of Xalles' wholly owned subsidiary, XTI. Xalles acquired Minerva for $3,750,000 and acquired MWH and its other subsidiaries for significantly less. Bowers received a payment of $99,794 as part of the Transaction. Ascento alleges, on information and belief, that the Minerva Defendants used items prepared by Ascento — including the executive summary, management presentation, target matrix, and valuation materials — during the course of their negotiations with the Xalles Defendants.

Also on March 31, 2020, Minerva, through its counsel, sought to terminate the Contract with Ascento via a termination letter. The letter stated that Minerva did not intend to pay Ascento the 5% performance fee set forth in the Contract. As the Transaction was consummated within twelve months after termination of the Contract period, Ascento has repeatedly sought to collect its fee since March 31, 2020.

Ascento calculates that the compensation owed is 5% of the transaction value for the sale of Minerva, or $187,500. Ascento also alleges that the Minerva Defendants misused and misappropriated Ascento's trade secrets, and as a result secured a significantly inferior purchase price compared to that which Ascento would have attained. Moreover, Ascento alleges that, as a result of Bowers' assurances that Minerva would continue to use Ascento's services, Ascento forewent two other prospective financial advisory clients — clients who would have generated approximately $390,000 in profits.

On August 6, 2020, Ascento filed its complaint alleging breach of contract, tortious interference with contract, fraud, unjust enrichment, quantum meruit, violation of the Defend Trade Secrets Act, and violation of the Delaware Uniform Trade Secrets Act. Ascento also seeks the imposition of a constructive trust on any property within the control of the Minerva Defendants or Xalles that is derived from, related to, or allocated for the Transaction, as well as declaratory judgment. On December 11, 2020, the Minerva Defendants moved to dismiss the complaint in its entirety for lack of personal jurisdiction, and also moved to dismiss the fraud claim for failure to state a claim on which relief can be granted and for failure to plead fraud with particularity. Plaintiff opposed the motion on January 4, 2021, and the Minerva Defendants submitted

a reply memorandum in further support of their motion to dismiss on January 11, 2021.

We first address the question of personal jurisdiction and then address the viability of plaintiff's fraud claim.

## II. **Personal Jurisdiction**

### a. Applicable Law

In opposing a motion to dismiss pursuant to Rule 12(b)(2) of the Federal Rules of Civil Procedure, plaintiff must demonstrate that the Court has jurisdiction over the defendants. <u>Whitaker v. Am. Telecasting, Inc.</u>, 261 F.3d 196, 208 (2d Cir. 2001); <u>see also</u> <u>Penguin Grp. (USA) Inc. v. Am. Buddha</u>, 609 F.3d 30, 34-35 (2d Cir. 2010) ("In order to survive a motion to dismiss for lack of personal jurisdiction, a plaintiff must make a prima facie showing that jurisdiction exists.") (citation omitted). Such a showing "entails making 'legally sufficient allegations of jurisdiction,' including 'an averment of facts that, if credited[,] would suffice to establish jurisdiction over the defendant.'" <u>Id.</u> at 35 (citation omitted). A plaintiff can make this showing through its "own affidavits and supporting materials," <u>Marine Midland Bank, N.A. v. Miller</u>, 664 F.2d 899, 904 (2d Cir. 1981), and the Court must "construe the pleadings and affidavits in plaintiff's favor," <u>PDK Labs, Inc. v. Friedlander</u>, 103 F.3d 1105, 1108 (2d Cir. 1997).

In resolving questions of personal jurisdiction in a diversity action, "a district court must conduct a two-part

inquiry." Met. Life Ins. Co. v. Robertson-Ceco Corp., 84 F.3d 560, 567 (2d Cir. 1996). "First, it must determine whether the plaintiff has shown that the defendant is amenable to service of process under the forum state's laws; and second, it must assess whether the court's assertion of jurisdiction under these laws comports with the requirements of due process." Id.

### i. New York's Long-Arm Statute

Plaintiff argues that the Court has personal jurisdiction over the Minerva Defendants under New York's long-arm statute. Section 302(a)(1) of the long-arm statute provides, in relevant part, that "a court may exercise personal jurisdiction over any non-domiciliary . . ., who in person or through an agent, transacts any business within the state." N.Y. C.P.L.R. § 302(a)(1). "To determine the existence of jurisdiction under section 302(a)(1), a court must decide (1) whether the defendant transacts any business in New York and, if so, (2) whether this cause of action arises from such a business transaction." Best Van Lines, Inc. v. Walker, 490 F.3d 239, 246 (2d Cir. 2007) (internal quotation marks omitted).

As to the first part of the test, "[i]n order to demonstrate that an individual is transacting business within the meaning of CPLR 302(a)(1), there must have been some 'purposeful activities' within the State that would justify bringing the nondomiciliary defendant before the New York courts." SPCA of Upstate New York,

Inc. v. Am. Working Collie Ass'n, 18 N.Y.3d 400, 404 (2012). In determining whether an out-of-state defendant transacts business in New York, the Court should consider a number of factors, including but not limited to, "whether the defendant has an ongoing contractual relationship with a New York corporation; whether the contract was negotiated in New York; and whether the defendant has visited New York in relation to the contract." Roxx Allison Ltd. v. Jewelers Inc., 385 F. Supp. 3d 377, 381 (S.D.N.Y. 2019) (citing Sunward Elecs., Inc. v. McDonald, 362 F.3d 17, 22 (2d Cir. 2004)).

As to the second part of the test, "a suit will be deemed to have arisen out of a party's activities in New York if there is an articulable nexus, or a substantial relationship, between the claim asserted and the actions that occurred in New York." Best Van Lines, 490 F.3d at 246 (quoting Henderson v. INS, 157 F.3d 106, 123 (2d Cir. 1998)). By contrast, "a connection that is 'merely coincidental' is insufficient to support jurisdiction." Sole Resort, S.A. de C.V. v. Allure Resorts Management, LLC, 450 F.3d 100, 103 (2d Cir. 2006) (quoting Johnson v. Ward, 4 N.Y.3d 516, 520 (N.Y. 2005)).

Under New York law, the meaning of "transact business" is broad, such that "a single transaction is sufficient, even if the defendant never enters the state, so long as the defendant's activities [in New York] were purposeful and there is a substantial relationship between the transaction and the claim asserted."

Porco v. Phoenix Bldg. Corp., No. 18 Civ. 5938, 2019 WL 2210659, at *4 (S.D.N.Y. May 21, 2019) (quoting Madden v. Int'l Ass'n of Heat & Frost Insulators & Asbestos Workers, 889 F. Supp. 707, 710 (S.D.N.Y. 1995)). Further, although Section 302(a)(1) is typically invoked in breach of contract cases, it also applies to actions in tort when supported by a sufficient showing of facts. Sunward Elecs., 362 F.3d at 24.

### ii. Constitutional Due Process

Even if a Court concludes that personal jurisdiction is proper under the New York long-arm statute, the Court must consider whether exercise of personal jurisdiction over the defendant is consistent with due process under the Constitution.

First, the defendants must have "have certain minimum contacts [with the forum state] such that the maintenance of the suit does not offend traditional notions of fair play and substantial justice." Int'l Shoe Co. v. State of Washington, 326 U.S. 310, 316 (1945) (internal quotation marks and citation omitted). Where the plaintiff asks the Court to assert specific jurisdiction over the defendants, the jurisdictional inquiry focuses on the "affiliation between the forum and the underlying controversy." Licci ex rel. Licci v. Lebanese Canadian Bank, SAL, 732 F.3d 161, 170 (2d Cir. 2013) (citation omitted).

Second, if the Court finds that the plaintiff has alleged that the defendants have minimum contacts with the forum sufficient

to establish personal jurisdiction, the Court then must determine whether it is "reasonable" to assert jurisdiction. To do so, the Court considers "(1) the burden that the exercise of jurisdiction will impose on the defendant; (2) the interests of the forum state in adjudicating the case; (3) the plaintiff's interest in obtaining convenient and effective relief; (4) the interstate judicial system's interest in obtaining the most efficient resolution of the controversy; and (5) the shared interest of the states in furthering substantive social policies." <u>Metro. Life Ins. Co. v. Robertson-Ceco Corp.</u>, 84 F.3d 560, 568 (2d Cir. 1996).

### b. Analysis

#### i. Long-Arm Statute

As the Minerva Defendants are Georgia domiciliaries who conducted business with Ascento, a New York company, plaintiff argues that the Court can assert jurisdiction over the Minerva Defendants pursuant to New York's long-arm statute. We agree. Below we assess the Court's jurisdiction over each Minerva Defendant in turn.

We begin with Minerva, the entity that entered into the Contract with Ascento. As to the first factor, we find that Minerva transacted business in New York because an agent of Minerva visited New York to discuss the Contract; the parties negotiated the Contract, in part, in New York; and Minerva maintained an ongoing contractual relationship with a New York corporation.

12

Roxx, 385 F. Supp. 3d at 381.  Prior to entering into the Contract,

DiBenerdini, Minerva's former CEO, met with Benjamin Boissevain,

Ascento's founder, in New York.[4]  Boissevain later worked on the

Contract from his New York office.  N. Fork Partners Inv. Holdings,

LLC v. Bracken, No. 20 Civ. 2444, 2020 WL 6899486, at *9 (S.D.N.Y.

Nov. 23, 2020) (finding jurisdiction under New York's long-arm

statute where, as here, the agreement at issue "was negotiated by

phone and email" such that "these communications had just as much

connection to New York as to [Georgia]").  Throughout the course

of the eight-month contract, Ascento worked — from New York — for

over 330 hours for Minerva.  The Minerva Defendants do not assert

that they did not know that they were entering into a contract

with a New York company, and indeed, they could not do so,

particularly given the address in the signature blocks of Ascento's

emails, the letterhead on the Contract, and Ascento's phone number

on the management presentation and executive summary.  This level

of activity in New York far exceeds the "single act" that this

statute requires.  Kreutter v. McFadden Oil Corp., 522 N.E.2d 40,

43 (1988); see also Roxx, 385 F. Supp. 3d at 383 ("[T]his case

does not involve an isolated transaction, nor was the defendant

---

[4] The Minerva Defendants dispute that DiBenerdini was Minerva's CEO at
the time.  Whether DiBenerdini was Minerva's CEO or not, the parties do not
dispute that DiBenerdini was operating as an agent of Minerva while visiting
New York.  See Compl. ¶ 17.

unaware of plaintiff's location. Defendant entered this relationship with eyes wide open.").

We next assess whether the causes of action asserted in the complaint arise from the defendant's business transactions in New York. Best Van Lines, 490 F.3d at 246. Here, it is abundantly clear from the complaint that each of the claims alleged arise from the contractual relationship between Ascento and Minerva, whether the claims are based in tort or contract. Sunward Elecs., 362 F.3d at 24 (finding jurisdiction under New York's long-arm with respect to both tort and contract claims).

The Minerva Defendants' arguments to the contrary are not persuasive. First, Minerva's contention that it did not enter New York is contradicted by the fact that its agent did. Minerva has only argued that DiBenerdini was not its CEO at the time, but has not disputed his broader agent status. And even were that truly in dispute, "the notion that a party need not have a physical presence in New York to be subject to CPLR 302(a)(1) jurisdiction is long recognized." Fischbarg v. Doucet, 38 A.D.3d 270, 274 (N.Y. App. Div. 2007), aff'd, 9 N.Y.3d 375 (2007). Here, there are numerous references to calls and emails exchanged with Ascento pursuant to the Contract. See id. ("[P]articularly in this day of instant long-range communications, one can engage in extensive purposeful activity here without ever actually setting foot in the State"). Second, the Minerva Defendants' argument that long-arm

jurisdiction does not exist because no money changed hands in the context of a case where plaintiff's allegation is that defendants failed to pay monies rightfully owed is seriously misguided.[5]

Plaintiff has also sufficiently alleged that the Court may assert jurisdiction over MWH. Though MWH is not a party to the Contract which forms the basis for the complaint, plaintiff alleges that MWH is Minerva's alter ego. Alter egos are treated as one entity for jurisdictional purposes. Transfield ER Cape Ltd. v. Indus. Carriers, Inc., 571 F.3d 221, 224 (2d Cir. 2009) (citation omitted). At the outset, we note that the Minerva Defendants do not challenge plaintiff's characterization of Minerva and MWH as alter egos of one another. Indeed, Ascento specifically alleges on information and belief that Bowers is founder, President, and CEO of both Minerva and MWH; that Minerva and MWH share common office space, employees, websites, and contact email addresses; and that the two companies do not maintain independent profits and

---

[5] The Minerva Defendants also rely on a series of cases where the court declined to exercise jurisdiction under the long-arm statute because New York was not the "center of gravity" for the circumstances at issue in the case. See, e.g., DirecTV Latin Am., LLC v. Park 610, LLC, 691 F. Supp. 2d 405 (S.D.N.Y. 2010). As an initial matter, as one court in this District recently observed, the center of gravity test no longer "accurately reflects the law as it applies to New York Courts." Roxx, 385 F. Supp. 3d at 382. In fact, the court noted that the "phrase seems to appear in New York State court decisions only in the context of choice-of-law analysis, not personal jurisdiction." Id. Even if we were to apply the center of gravity test, "New York is plainly at least one center of gravity of the transaction[] at issue," as the lion's share of the work took place in New York and one of the two parties to the Contract is located in New York. Id. The courts' conclusions in Skrodzki v. Marcello, 810 F. Supp. 501, 509 (E.D.N.Y. 2011), and Maranga v. Vira, 386 F. Supp. 2d 299, 306 (S.D.N.Y. 2005), upon which the Minerva Defendants rely, are both understandable and distinguishable.

are not adequately capitalized on an independent basis. Compl.

¶ 140. Under these circumstances, we find that plaintiff has

adequately alleged that MWH is the alter ego of Minerva for

purposes of asserting personal jurisdiction over MWH pursuant to

the long-arm statute.

We next turn to whether the Court can exercise jurisdiction

over Bowers. "[U]nder New York law, if a corporation has

sufficient in-state contacts to fall subject to personal

jurisdiction, then a corporate officer who has 'played a part in

the [corporate] activities that gave rise to the action' is

likewise subject to jurisdiction, to the extent that due process

permits, due to the agency relationship between the corporation

and the officer." Ramiro Aviles v. S & P Glob., Inc., 380 F. Supp.

3d 221, 261 (S.D.N.Y. 2019) (citing Arch Specialty Ins. Co. v.

Entm't Specialty Ins. Servs., Inc., No. 04 Civ. 1852, 2005 WL

696897, at *4 (S.D.N.Y. Mar. 24, 2005)). Bowers challenges the

Court's assertion of jurisdiction over him, arguing that he did

not sign the Contract in his personal capacity (instead, he did so

as founder, President, and CEO of Minerva), that he executed the

Contract in Georgia, and that he never set foot in New York for

the purpose of meeting with Ascento regarding a business

relationship. However, Bowers' arguments fail, as New York has

declined to adopt the fiduciary shield doctrine, which provides

that an individual should not be subject to jurisdiction if his

dealings in the forum state were solely in a corporate capacity. See Kreutter, 71 N.Y.2d at 470 ("Nothing in the statute's language or the legislative history relating to it suggests that the Legislature intended to accord any special treatment to fiduciaries acting on behalf of a corporation or to insulate them from long-arm jurisdiction for acts performed in a corporate capacity."). Moreover, while "[t]he fact that a corporate officer may not invoke the fiduciary shield doctrine does not mean that the corporate officer is automatically subject to long arm jurisdiction," Hypoxico, Inc. v. Colorado Altitude Training LLC, No. 02 Civ. 6191, 2003 WL 21649437, at *3 (S.D.N.Y. July 14, 2003), here, Bowers himself satisfies the statute's requirements. As Bowers signed the Contract at issue in this case and conferred with Ascento regarding the Contract, the Court may exercise jurisdiction over him. N. Fork Partners, 2020 WL 6899486, at *10 (finding jurisdiction over out-of-state corporate officer proper because he signed ongoing agreement with company in New York).[6]

Having concluded that the Court may exercise jurisdiction over each of the Minerva Defendants pursuant to New York's long-

_____

[6] As the Court finds that jurisdiction is proper pursuant to Section 302(a)(1) of the long-arm statute, we need not assess plaintiff's argument that jurisdiction is proper pursuant to Section 302(a)(3) because the injury from Bowers' alleged fraud was suffered in New York. Aboutaam v. El Assaad, No. 18 Civ. 8995, 2020 WL 1547458, at *10 (S.D.N.Y. Mar. 31, 2020).

arm statute, we now assess whether it comports with due process to
do so.

## ii. Constitutional Due Process

As an initial matter, we note that "[c]ompliance with New
York's long-arm statute usually — though not invariably — results
in compliance with the constitutional standard as well." Joint
Stock Co. Channel One Russia Worldwide v. Infomir LLC, No. 16 Civ.
1318, 2017 WL 825482, at *15 (S.D.N.Y. Mar. 2, 2017); see also
Licci, 732 F.3d at 170 ("[D]espite the fact that section 302(a)(1)
of New York's long-arm statute and constitutional due process are
not coextensive, and that personal jurisdiction permitted under
the long-arm statute may theoretically be prohibited under due
process analysis, we would expect such cases to be rare."). Here,
the Court is satisfied that minimum contacts exist, which gave
rise to the claims at issue. The Minerva Defendants purposefully
engaged in an eight-month business relationship with a New York
company. The Minerva Defendants, moreover, signed the Contract
with New York-based Ascento, communicated with Ascento throughout
the duration of the Contract, received deliverables from Ascento,
and reaffirmed the Contract in January 2020. See Roxx, 385 F.
Supp. 3d at 383.[7]

---

[7] As plaintiff does not assert that the Court has general jurisdiction
over the Minerva Defendants, the Court is puzzled by the Minerva Defendants'
argument regarding due process, which focuses substantially on an overview of
Supreme Court jurisprudence on general jurisdiction. See Mem. in Support of
Mot. to Dismiss, ECF No. 33, at 20-23.

The Court also concludes that exercising jurisdiction over the Minerva Defendants is reasonable.  Though New York is not the most convenient forum for the Minerva Defendants, who chose to contract with a New York entity, the distance between Atlanta and New York is unlikely to cause undue burden.  Moreover, courts have an interest in properly enforcing contracts made within their jurisdiction and in ensuring that its residents obtain convenient and effective relief.  Metro. Life, 84 F.3d at 568.

Having found that jurisdiction is proper under New York's long-arm statute and consistent with due process, this Court will exercise jurisdiction over the Minerva Defendants.  Sunward Elecs., 362 F.3d at 24.  Thus, the Minerva Defendants' motion to dismiss for lack of personal jurisdiction is denied in its entirety.

III.  **Fraud Claim**

The Minerva Defendants next move to dismiss plaintiff's fraud claim, arguing that the complaint fails to state a claim upon which relief can be granted and fails to meet the specificity standard of Federal Rule of Civil Procedure 9(b).  The Minerva Defendants also argue that the claim is duplicative of plaintiff's breach of

contract claim.  We assess the viability of plaintiff's fraud claim below.

### a. Applicable Law[8]

To survive a motion to dismiss pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure, a plaintiff must allege facts sufficient "to state a claim to relief that is plausible on its face." Bell Atlantic Corp. v. Twombly, 550 U.S. 544, 570 (2007)). A claim is facially plausible if "the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009).

Under New York law, "[i]n order to establish fraud, a plaintiff must show a material misrepresentation of an existing fact, made with knowledge of its falsity, an intent to induce reliance thereon, justifiable reliance upon the misrepresentation, and damages." MBIA Ins. Corp. v. Countrywide Home Loans, Inc., 87 A.D.3d 287, 293 (N.Y. App. Div. 2011) (citation omitted). Omissions also can constitute fraud, but only where there is a duty to disclose, which "arises only from a fiduciary or other relationship of trust and confidence." In re Parmalat Sec. Litig., 479 F. Supp. 2d 332, 341 (S.D.N.Y. 2007).  Claims of fraud are

---

[8] In its complaint, plaintiff relies on Delaware law, which is consistent with the governing law set forth in the Contract.  However, in their submissions, the parties cite to New York law with respect to the fraud claim.  As the law on fraud is virtually the same under both New York and Delaware law, we likewise rely on New York law.

subject to a heightened pleading standard pursuant to Federal Rule of Civil Procedure 9(b).

Moreover, when a plaintiff brings a fraud claim alongside a breach of contract claim, the fraud claim may proceed only where plaintiff (1) establishes a legal duty separate from defendant's duty to perform under the contract; (2) demonstrates a fraudulent misrepresentation extraneous to the contract, or (3) identifies special damages. Bridgestone/Firestone, Inc. v. Recovery Credit Svcs., Inc., 98 F.3d 13, 20 (2d Cir.1996) (citations omitted). Thus, "[u]nder New York law, a fraud-based claim must be 'sufficiently distinct from [a] breach of contract claim' where it stems from an alleged breach of contract." Kriegel v. Donelli, No. 11 Civ. 9160, 2014 WL 2936000, at *13 (S.D.N.Y. June 30, 2014) (quoting Bridgestone/Firestone, 98 F.3d at 20).

### b. Analysis

Plaintiff's fraud claim arises from a series of communications (or lack thereof) with Bowers, the founder, CEO, and President of Minerva and MWH, beginning in January 2020. On January 8, 2020, in response to an inquiry from Ascento following the departure of Minerva's alleged former CEO, Bowers represented that Minerva wanted to keep working with plaintiff. Then, seven days later, on January 15, 2020, Bowers represented that Minerva was taking a hiatus from pursing M&A activity but would contact plaintiff when it was prepared to resume. Nevertheless, within

approximately two months, MWH entered into the Transaction with the Xalles Defendants without notice to or involving plaintiff. Plaintiff alleges that, in anticipation of its future resumption of work for Minerva, it declined two opportunities for engagement by other clients.  Plaintiff argues that the Minerva Defendants committed fraud when they falsely claimed an intention to take a break from M&A activity and when they failed to inform plaintiff about the Transaction.

Even assuming, <u>arguendo</u>, that Bowers' representations were deliberately false, only in narrow circumstances can fraud and breach of contract claims[9] be alleged alongside one another. <u>Bridgestone/Firestone</u>, 98 F.3d at 20.  Ascento endeavors to mold its fraud claim to fit within each of the <u>Bridgestone/Firestone</u> circumstances.  Ascento's efforts fail.

First, plaintiff attempts to allege that a fiduciary duty arose between Ascento and Minerva from a straightforward contract for the provision of advisory services.  Whatever duties Ascento owed Minerva, the complaint does not allege that the Contract between the parties recited a fiduciary obligation, nor does plaintiff suggest, by reference to the complaint, caselaw, or any other authority, any basis for an assertion that Minerva owed a

_____

[9] Plaintiff asserts two breach of contract claims, the first with respect to the Contract's compensation agreement and the second with respect to the Contract's confidentiality agreement.  Here, it appears that plaintiff seeks to maintain its fraud claim alongside its first breach of contract claim.

fiduciary duty to Ascento.[10]  In fact, the Contract itself states that Minerva contracted with Ascento on an "arm's-length basis," that it is "not the intent of the parties to create a fiduciary relationship," and that "Ascento Capital will act under this agreement as an independent contractor with duties solely to [Minerva]."  ECF No. 37-3 at 5.  In an apparent recognition of this void, in a footnote plaintiff offers to amend its complaint to allege that a fiduciary duty did exist between the parties. However, this naked offer, unsupported by case authority or a proposed pleading consistent with Rule 11, is clearly insufficient.  In re Ferrellgas Partners, L.P., Sec. Litig., No. 16 Civ. 7840, 2018 WL 2081859, at *21 (S.D.N.Y. Mar. 30, 2018), aff'd, 764 F. App'x 127 (2d Cir. 2019).

Second, plaintiff asserts in a conclusory manner that Bowers' statements were "wrongdoings" that "exceeded the scope of the Contract's terms."  Pl.'s Opp. to Defs.' Mot. to Dismiss, ECF No. 36 at 24.  "With respect to the second Bridgestone factor, in assessing whether an alleged fraudulent representation should be considered 'collateral or extraneous to the contract,' 'as a matter of both logic and law, the primary consideration . . . is whether the contract itself speaks to the issue.'"  Kriegel, 2014 WL

---

[10] The Contract provides that Minerva "will not, and will not permit any third party to, disclose or otherwise refer to such advice or information without Ascento Capital's prior written consent," ECF No. 37-3 at 4, but this confidentiality obligation does not impart a fiduciary duty.

23

2936000, at *14 (citing Great Earth Int'l Franchising Corp. v. Milks Dev., 311 F. Supp. 2d 419, 426–27 (S.D.N.Y. 2004)). Here, the Contract requires that Minerva pay to Ascento a 5% fee upon the consummation of a transaction regardless of Ascento's involvement in the transaction itself. Thus, even if Bowers intended to induce Ascento to refrain from involvement in the Minerva Defendants' M&A activities in early 2020, his representation was not extraneous to the Contract. In fact, the Contract explicitly contemplates Ascento's exclusion from Minerva's M&A activity by its inclusion of a provision that entitled Ascento to a 5% fee arising from any transaction that occurred within 12 months following the termination of the Contract. Though Ascento may be frustrated that Bowers excluded it from its M&A activity, this does not transform plaintiff's cause of action into an entirely distinct fraud claim. Indeed, plaintiff could not assert this claim absent the Contract, and thus we find it duplicative of the breach of contract claim. TN Metro Holdings I, LLC v. Commonwealth Ins. Co., 51 F. Supp. 3d 405, 411 (S.D.N.Y. 2014); see also BNP Paribas Mortg. Corp. v. Bank of Am., N.A., 949 F. Supp. 2d 486, 505 (S.D.N.Y. 2013) ("New York law makes clear that the allegedly tortuous conduct must be such that there would be liability even if no contract existed.") (internal quotation marks and citation omitted).

Third, plaintiff attempts to allege the existence of special damages, however this claim does not survive even the most cursory analysis. Ascento reports to have conducted 330 hours of work for Minerva — an average of only 55 hours per month between July 2019 and January 2020. Notwithstanding, plaintiff alleges that it declined additional client work in anticipation of the resumption of work for Minerva, and thus is entitled to $390,000 in damages arising from lost business opportunities. Far from an actionable claim for special damages, plaintiff's lost business opportunities are nothing more than self-inflicted wounds: the Court is not persuaded that Ascento could not simultaneously accommodate additional clients and its work for Minerva, particularly as the Minerva Defendants did not indicate when they would actually resume M&A activity. See Geary v. Hunton & Williams, 684 N.Y.S.2d 207, 207 (N.Y. App. Div. 1999) (New York law does not recognize as special damages "the loss of an alternative bargain overlooked in favor of the fraudulent one," as they are "inherently speculative and undeterminable.").

As plaintiff fails to plead a viable fraud claim that is separate and apart from it breach of contract claim, we grant defendants' motion to dismiss the fraud claim.

## IV.   **Conclusion**

For the foregoing reasons, the Court grants in part and denies in part defendants' motion to dismiss. The Clerk of Court is

respectfully directed to terminate the motion pending at docket entry 32.

**SO ORDERED.**

DATED:     New York, New York
           June 1, 2021

_____
            NAOMI REICE BUCHWALD
        UNITED STATES DISTRICT JUDGE